HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANDRES A. MUNT-LOVELL, NICHOLAS P. MUNT-LOVELL,

Plaintiffs,

v.

THE INTERNATIONAL CAT ASSOCIATION, et al.,

Defendants.

CASE NO. 2:25-cv-01665-RAJ

ORDER

## I. INTRODUCTION

THIS MATTER comes before the Court on Defendants' Motion to Dismiss, Dkt. No. 29 (the "Motion"). The Court has reviewed the motion, the submissions in support of and in opposition to the motion, and the balance of the record. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

## II. BACKGROUND

This case arises from the deterioration of business relations between Plaintiffs Andres and Nicholas Munt-Lovell and Defendants The International Cat Association ("TICA") and some of its leaders: Vicki Jo Harrison, Frances Cardona, Brenda Russo, and Laurie Yates-Schiff. According to the Amended Complaint, Dkt. No. 20 ("FAC"),

Plaintiffs were "longstanding, respected members of [TICA]" who "founded the SeaCats club, successfully hosted multiple licensed shows, … and were entrusted by TICA's leadership with hosting the 2023 TICA Annual" in Tacoma, Washington, one of the cat-fancy organization's "most significant events." FAC ¶¶ 2–3, 23–24.

In preparation for the 2023 TICA Annual, Plaintiffs secured the Greater Tacoma Convention Center ("GTCC") as the host venue, "advanc[ing] funds for deposits and carr[ying] personal risk on behalf of the organization." *Id.* ¶¶ 27–29. During the planning period, Plaintiffs allege that Defendants TICA and Harrison imposed "unusual oversight requirements" on them, including "quarterly updates on the Annual's planning and finances." *Id.* ¶¶ 30–31. Plaintiffs further allege that "[t]o accommodate TICA leadership's request that banquet and meeting activities be consolidated at a pet-friendly property, Plaintiffs relocated all such functions from GTCC to the Marriott [Downtown Tacoma]." *Id.* ¶ 33. That change "triggered a $5,000 penalty under the GTCC agreement," and the new Marriott contract "imposed an 85% room-block attrition requirement" and a $30,000 food-and-beverage minimum. *Id.* ¶¶ 33, 56, 105. Plaintiffs allege that several Defendants were aware of the Marriott contract's terms and "expressly approved its execution." *Id.* ¶¶ 33, 36, 59.

On August 21, 2023, Plaintiffs notified several TICA officers that the event's ability to meet the Marriott contract's terms was at risk. *Id.* ¶ 36. The next day, Plaintiff Nicholas Munt-Lovell was hospitalized, causing delays in planning the event. *Id.* ¶¶ 38–40. By late August, Plaintiffs allege that Defendants Harrison, Cardona, and Russo had "demanded unauthorized access to SeaCats' financial accounts" and "directed hotels to reroute communications and revenue streams." *Id.* ¶¶ 5, 41–47. Defendants further demanded that Plaintiffs "relinquish control of SeaCats finances," and Plaintiffs allege they "were falsely accused of drug use and intoxication—statements later repeated within TICA and online," leading to their resignation as show managers of the 2023 Annual. *Id.* ¶¶ 48–52. Plaintiffs further allege that, at that time, Defendant Russo "began circulating rumors that Plaintiffs

were 'drug addicts' and had 'snorted up the banquet money'" and "spread defamatory rumors that Plaintiffs were drug addicts, embezzlers, and animal abusers." *Id.* ¶¶ 106–07, 154, 186.

Ultimately, the 2023 Annual did not meet the Marriott contract's attrition threshold, triggering approximately $22,000 in damages, and the hotel called in the food-and-beverage minimum early. *Id.* ¶ 56. At that time, the shortfall totaled roughly $52,000. *Id.* ¶ 59. After an October 2023 meeting, the TICA Board published a statement that "[u]pon arrival in Tacoma we were informed about outstanding monies which were required to be paid for the [2023 Annual] to move forward. We advanced the necessary funds." *Id.* ¶ 68. It also announced it would "set a hearing regarding further actions against the responsible parties within SeaCats." *Id.* Later that month, Defendant Cardona sent Plaintiffs an invoice totaling $62,923.74 and warned that failure to pay the debt could result in Plaintiffs' placement on TICA's temporary suspension list. *Id.* ¶¶ 74–77. And Plaintiffs were suspended shortly thereafter. *Id.* ¶ 78.

On January 19, 2024, the TICA Board authorized litigation against Plaintiffs to recover the debt. *Id.* ¶ 94. In May 2024, Plaintiffs attended a Board meeting at which Defendant Harrison had them removed. *Id.* ¶ 82. TICA then permanently revoked SeaCats' charter, and SeaCats was dissolved later that year. *Id.* ¶¶ 84–85. On September 6, 2024, Defendant Cardona continued pursuing the debt on behalf of TICA, addressing an "audit confirmation" letter to external auditors, copying Plaintiffs, asserting that Plaintiffs owed the organization $63,532.59. *Id.* ¶ 86.

On August 7, 2025, Plaintiffs demanded that TICA pay them $250,000 for "wrongful expulsion, defamation, conversion, fiduciary breaches, and financial harm" and issue a public apology. *Id.* ¶ 93. On August 21, Defendants TICA and Yates-Schiff filed suit against Plaintiffs in California state court, alleging fraud in connection with their planning for the 2023 Annual. *Id.* ¶ 95.

On August 28, after the California suit had been filed, Plaintiffs commenced this action and "advis[ed] [TICA's Board] … that if TICA pursued the California matter it would constitute retaliation and abuse of process." *Id.* at 25 ¶ 99. Plaintiffs allege that Defendants' actions in the California suit "confirm[ed] that escalation, not dispute resolution, was the intended purpose of the litigation." *Id.*

Defendants moved to dismiss the Amended Complaint for failure to state a claim. Dkt. No. 29 ("Motion").[1] Plaintiffs opposed the Motion, Dkt. No. 31 ("Opposition"), and Defendants then filed a reply in support, Dkt. No. 32 ("Reply").

## III. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In analyzing a motion to dismiss, courts "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). "Conclusory allegations and unreasonable inferences, however, are insufficient to defeat a motion to dismiss." *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

## IV. DISCUSSION

As a threshold matter, the Amended Complaint contains a myriad of allegations in a disorganized fashion, rendering the factual basis for several of Plaintiffs' claims a puzzle. For example, the Amended Complaint describes individuals or entities without further explanation of who they are and what bearing they have on Plaintiffs' claims, such as

[1] Defendants admit they failed to comply with the Court's standing order to meet and confer before filing a motion. *See* Opp. at 3–4; Reply at 12–13. However, Defendants explain that the parties conferred before their Reply was filed and were unable to reach a compromise. Considering Defendants' representation, the Court will address this dispositive motion on its merits.

"Defendant Danielle Petersen," FAC ¶ 53, or "Defendant Prince," *id.* ¶ 187, who are *not* named defendants, or "Helms-Briscoe," *id.* ¶ 33. Moreover, the Amended Complaint purports to bring claims against three of the defendants—Harrison, Russo, and Yates-Schiff—in their individual and official capacities but fails to specify which capacity applies to which claims. *See* FAC at 6 ("Individual Defendants (Personal Capacity and Official Capacity *Where Applicable*)") (emphasis added). In light of the leniency afforded to *pro se* litigants, the Court declines Defendants' invitation to dismiss the Amended Complaint for failure to meet Rule 8's obligations. Mot. at 5–6. However, to the extent Plaintiffs believe this Order does not address claims they believe they have pled, the Court dismisses any such claims for failure to state a claim.

As best the Court can discern, the Amended Complaint asserts eight claims containing roughly fourteen distinct causes of action. Based on that understanding, the Court will analyze each cause of action in turn.

**A. Count I: "Defamation and False Light"**

Count I combines two distinct causes of action—defamation and false light—and invokes Washington's Consumer Protection Act ("CPA"), RCW 19.86. Accordingly, the Court will address these three claims separately.

**i. Defamation**

Plaintiffs allege that Defendants defamed them by falsely accusing them of drug use, theft, and financial misconduct. FAC at 26 ¶¶ 102–21. Defendants argue that the claim fails because (1) the statements concerning substance abuse are true, (2) the allegations fail to identify the defamatory statements with sufficient specificity, (3) the statements of non-parties are irrelevant, (4) the communications were privileged, and (5) neither fault nor harm is adequately alleged. Mot. at 7–9. Plaintiffs respond that the Amended Complaint "identifies the speakers, substance, audiences, and time frame of the statements" and that Defendants' privilege and truth arguments raise factual questions not properly resolved on a motion to dismiss. Opp. at 6.

To state a defamation claim, a plaintiff must show (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Mohr v. Grant*, 108 P.3d 768, 773 (Wash. 2005). In addition to a false statement, defamation by implication can be actionable if the plaintiff shows "that the communication left a false impression that would be contradicted by the inclusion of omitted facts." *Id.* at 776. However, "[m]erely omitting facts favorable to the plaintiff or facts that the plaintiff thinks should have been included does not make a publication false and subject to defamation liability." *Id.*

1. **Defendant Russo's Statements**

Plaintiffs allege that beginning in August 2023, Russo told "exhibitors, judges, and club directors" that Plaintiffs were "drug addicts" who were "high during the Annual" and had "snorted up the banquet money," and that Russo repeated these statements "in person, via social media, and in internal communications." FAC ¶¶ 16(a)(i), 63, 106, 186. Plaintiffs allege that these statements were false, *id.* ¶ 16(a)(ii), and that Russo made them "despite knowing the statements were false," *id.* ¶ 154. Plaintiffs also allege that they "did not receive, handle, or retain any banquet or food-and-beverage revenue," *id.* ¶ 57, and that Russo took control of the event's finances and "collected all income paid at the show," *id.* ¶¶ 41, 47. Taken as true, these allegations support an inference that Russo knew that her accusations were false, or at a minimum acted in reckless disregard of their falsity.

Defendants' contention that the statements concerning substance abuse were true does not change the Court's conclusion. At this stage, the Court must accept as true Plaintiffs' allegation that Russo's accusations were false. *See Iqbal*, 556 U.S. at 678. Defendants contend that petitions filed in other proceedings demonstrate the statements concerning drug addiction were true, *see* Mot. at 7–8, but the Court may not consider them for the truth of their contents at this stage. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (noting "a court cannot take judicial notice of disputed facts" contained in judicially noticeable public records). And even if the Court could, Defendants' argument concerns only Nicholas Munt-Lovell's alleged substance abuse, so

it would not reach Russo's accusations as to Andres Munt-Lovell or as to Plaintiffs' alleged misappropriation of the banquet money.

2. **TICA's October 11, 2023 Statement**

Plaintiffs allege that on October 11, 2023, TICA's Board, with Defendant Harrison's approval, published a statement that "[u]pon arrival in Tacoma we were informed about outstanding monies which were required to be paid for the show and banquet to move forward," that TICA "advanced the necessary funds," and that it would pursue "further actions against the responsible parties within SeaCats." FAC ¶¶ 14(a)(vii), 68. Plaintiffs allege that the statement was false because the show "was never in danger of cancellation," *id.* ¶ 69(a), and that it "falsely suggested that Plaintiffs had concealed the shortfall and forced TICA to 'advance funds,'" *id.* ¶ 70. Plaintiffs also detail the omitted facts that would have contradicted that false suggestion: that they disclosed the projected shortfall to TICA's leadership, including Harrison, weeks earlier on August 21, 2023, *id.* ¶ 36, and that TICA's leadership, again including Harrison, was aware of and had approved the underlying contract terms, *id.* ¶¶ 33, 36–37. Thus, Plaintiffs have plausibly alleged that TICA and Harrison knew the impression that the statement conveyed was false.

3. **The Debt Statements**

Plaintiffs also allege that three statements asserting that they owed TICA money were defamatory: (1) Defendant Cardona's October 26, 2023 invoice for $62,923.74 in debts owed personally by Plaintiffs or SeaCats, *id.* ¶¶ 74–76, 121; (2) TICA's placement of Plaintiffs on its Temporary Suspension List in *The TICA Trend*, "falsely portraying [them] as financially delinquent," *id.* ¶¶ 78, 114, 121; and (3) Cardona's September 6, 2024 "audit confirmation" letter that Plaintiffs owed TICA $63,532.59, *id.* ¶¶ 86, 110, 121.

Plaintiffs fail to plausibly allege that the underlying premise of these statements—that Plaintiffs owed TICA money—was false. Plaintiffs allege that TICA's leadership "reviewed, approved, and voted to pay" the invoiced expenses, *id.* ¶ 75, but approving a contract's terms or voting to cover a shortfall does not necessarily mean that TICA agreed

to absorb the cost rather than "advance" it—the term Plaintiffs use, *id.* ¶ 73, and one that ordinarily contemplates repayment. These allegations are thus as consistent with TICA having covered SeaCats' (or Plaintiffs') contractual obligations to third parties with the expectation of reimbursement as with TICA having assumed those obligations. *See Iqbal*, 556 U.S. at 678 (a complaint pleading facts "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility"). Plaintiffs' remaining allegations do not close that gap. Plaintiffs' allegation that TICA "knowingly assum[ed] responsibility for those liabilities," FAC ¶ 73—without more—is a legal conclusion which the Court need not accept as true. Nor do Plaintiffs allege any agreement under which TICA, rather than SeaCats, bore the financial risk of the 2023 Annual. Because the Amended Complaint does not plausibly allege that these debt statements were false, they cannot support Plaintiffs' defamation claim.

4. **The Remaining Statements**

The Court will briefly address the remaining statements for which the Court concludes that Plaintiffs failed to state a defamation claim: *First*, Defendant Harrison's September 19, 2023 Facebook post stating that "various reports" were circulating about the 2023 Annual, and that TICA would seek a "resolution," FAC ¶¶ 54, 109, is not sufficiently alleged to be false, and its alleged implication that Plaintiffs were under investigation is consistent with Plaintiffs' own allegation that TICA announced a hearing the next day, *id.* ¶¶ 55, 66. *Second*, Defendant Yates-Schiff telling Nicholas Munt-Lovell to "man up," *id.* ¶ 107, is not an actionable statement of fact, and Yates-Schiff's "repeating false insinuations of drug use, show mismanagement and financial impropriety," *id.*, lacks adequate specificity. *Third*, the unattributed accusation at the September 1, 2023 confrontation, leaked executive-session discussions, unspecified Board minutes, and allegations of vague rumors do not identify a specific speaker and/or statement. *Id.* ¶¶ 50, 65, 90, 113, 115. *Fourth*, statements by non-parties Prince, Petersen, and Robinson do not

support a defamation claim against Defendants. *See, e.g.,* FAC ¶¶ 39, 64, 107, 154, 166, 187, 191.

5. **Privilege and Damages**

For Russo's statements and TICA's October 11, 2023 statement, the Court finds the remaining privilege and damages elements adequately pled. On privilege, Defendants contend they were privileged communications because the statements were shared with persons who had a "common interest" in their subject matter, such as TICA's members. Mot. at 9. Such a privilege indeed exists for a nonprofit association's officers' communications about its members, but that privilege is qualified—it is lost if the speaker "knows the matter to be false or acts in reckless disregard as to its truth or falsity." *Moe v. Wise*, 989 P.2d 1148, 1154–57 (Wash. Ct. App. 1999). Here, because Plaintiffs plausibly allege that Russo and the TICA Board knew their statements were false, the Court cannot conclude that privilege bars the claim as a matter of law. Moreover, Plaintiffs allege the October 11, 2023 statement was made to the public, not only to TICA members. FAC ¶ 14(a)(vii).

On damages, Defendants also contend that Plaintiffs' assertion of "'reputational harm,' without any further elaboration," fails to satisfy the damages element. Mot. at 9. But Plaintiffs' allegations are more detailed than Defendants portray: They allege that the accusations of substance abuse and misconduct against them "spread throughout TICA's closed, reputation-dependent community, causing immediate and severe harm," FAC ¶ 5, and that they suffered "exclusion from the cat fancy marketplace, economic losses including loss of clients, and emotional distress," *id.* ¶ 120. Taken together, these allegations plausibly show that the statements at issue resulted in the "impairment of

reputation and standing in the community," which is an injury a defamation claim customarily redresses.[2] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

Accordingly, the Court denies the Motion as to Plaintiffs' defamation claim based on (1) Russo's statements, against Russo in her individual capacity, and (2) the October 11, 2023 statement, against TICA and Harrison in her individual capacity.[3] The Court grants the Motion as to Plaintiffs' defamation claim based on any other statement alleged in the Amended Complaint.

**ii. False Light**

Plaintiffs also allege that Defendants' statements "placed Plaintiffs in a false light, portraying them as criminals, addicts, and fraudulent actors." FAC ¶ 112. Defendants contend Plaintiffs failed to plead Defendants' actions "would be highly offensive to a reasonable person" and that Defendants "knew of or recklessly disregarded the falsity of the publication." Mot. at 9–10. Plaintiffs respond that accusing them of being "drug addicts, embezzlers, and animal abusers constitutes highly offensive publicity undertaken with knowledge or reckless disregard of falsity." Opp. at 6.

Such a claim "arises when someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which

---

[2] Plaintiffs also invoke defamation per se. *See* FAC at 26 ¶ 98. Because the Court finds that Plaintiffs sufficiently alleged the damages element, the Court need not decide at this stage whether any statement is defamatory per se.

[3] Plaintiffs name Russo and Harrison in both their individual and official capacities. The claims that survive proceed against Russo and Harrison in their individual capacities. That Harrison is alleged to have approved the October 11, 2023 statement "[i]n her role as President," FAC ¶ 14(a), does not preclude her personal liability: "[i]f a corporate officer participates in wrongful conduct or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable …." *Grayson v. Nordic Constr. Co.*, 599 P.2d 1271, 1274 (Wash. 1979).

Defendants also argue that RCW 24.03A.540 bars Plaintiffs' claims against Harrison. Mot. at 6–7. That statute limits a director's liability to a member for actions taken "as a director," but excepts a "knowing infliction of harm upon the member," which Plaintiffs plausibly allege. *See* RCW 24.03A.540(4), (5)(a); *see also infra* n.8.

the other would be placed." *Eastwood v. Cascade Broad. Co.*, 722 P.2d 1295, 1297 (Wash. 1986). Because Plaintiffs' false light claim requires a false publication and rests on the same statements as their defamation claim, it fails as to every statement except Defendant Russo's accusations and TICA's October 11, 2023 statement for the reasons discussed above. *See supra* Section IV.A.i.

As for those two statements, Defendants' arguments fail. Accusations that Plaintiffs were "drug addicts" who had "snorted up the banquet money," FAC ¶ 106, and a public statement implying that Plaintiffs had concealed a significant shortfall for which TICA "advanced the necessary funds," *id.* ¶¶ 68, 70, would plausibly be highly offensive to a reasonable person. And, as discussed above, Plaintiffs plausibly allege that Russo, Harrison, and TICA knew their statements were false when they made them. *See supra* Section IV.A.i.

Accordingly, the Court denies the Motion as to Plaintiffs' false light claim based on (1) Russo's statements, against Russo in her individual capacity, and (2) the October 11, 2023 statement, against TICA and Harrison in her individual capacity.[4] The Court grants the Motion as to Plaintiffs' false light claim based on any other statement alleged in the Amended Complaint.

**iii. Washington's Consumer Protection Act**

Plaintiffs also invoke Washington's Consumer Protection Act, RCW 19.86, in connection with Counts I, II, and III, and seek treble damages under the statute. FAC at 26 ¶ 100; *see also id.* ¶¶ 117, 119–20, 123, 134, 137, 146. To state a CPA claim, a plaintiff must allege: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). Plaintiffs' allegations describe a dispute limited to TICA, a membership association, and two of its members over the planning of an event and internal disciplinary

[4] *See supra* n.3.

actions. Plaintiffs have failed to offer any non-conclusory allegations that adequately plead the third element. *See* RCW 19.86.093(3) (describing an act as injurious to the public interest if it injured other persons or had or has the capacity to injure other persons). Accordingly, Plaintiffs' CPA claim fails.

**B. Count II: "Conversion & Unjust Enrichment"**

Count II combines two distinct causes of action: conversion and unjust enrichment. Accordingly, the Court will address these two claims separately.

**i. Conversion**

In support of their conversion claim, Plaintiffs allege that Defendant Russo "withdrew $800 from SeaCats' PayPal without authorization, inserted her personal account as the payout destination in TicketLeap and handled all money collected at the show" at Defendant Harrison's direction. FAC ¶ 126; *see also* Opp. at 10–11. Defendants primarily argue Plaintiffs' conversion claim fails because (i) SeaCats is not a party to this action and (ii) Plaintiffs consented to Russo's access to SeaCats' account. Mot. at 11–12.

Conversion is "(1) willful interference with chattel belonging to the plaintiff, (2) by either taking or unlawful retention, and (3) thereby depriving the owner of possession." *Burton v. City of Spokane*, 482 P.3d 968, 970 (Wash. Ct. App. 2021). The plaintiff must show "some affirmative wrongful act by the defendant, either an actual conversion by the defendant or a demand for, and a refusal of, the property where this is relied on to establish the conversion." *Schneider Nat'l Carriers, Inc. v. Fireworks Nw., LLC*, No. C15-0747, 2017 WL 1438035, at *2 (W.D. Wash. Apr. 24, 2017) (citing *Brown ex rel. Richards v. Brown*, 239 P.3d 602, 610 (Wash. Ct. App. 2010)).

Plaintiffs do not allege that Defendants took or retained property belonging to them; instead, by their own allegations, the purported takings concern only the property of SeaCats. *See, e.g.,* FAC ¶¶ 45 ("Russo withdrew approximately $800 from *SeaCats'* PayPal account…"), 46 ("Russo and Harrison arranged for *the club's* private TicketLeap ticket-sales revenue …") (emphases added). Plaintiffs respond that they need not "resolve

ownership questions or corporate formalities" at this stage and must allege only "deprivation of property in which they had a possessory interest." Opp. at 11. But Plaintiffs' allegations do not plausibly establish that they are entitled to the property, only that SeaCats might be. Accordingly, Plaintiffs' conversion claim fails.

**ii. Unjust Enrichment**

In support of their unjust enrichment claim, Plaintiffs allege that they, for example, "personally advanced deposits and funds … including GTCC deposits, Marriott deposits, and vendor payments" and Defendants "retain[ed] the benefits of Plaintiffs' labor and expenditures." FAC ¶¶ 125, 133.

To state a claim for unjust enrichment, Plaintiffs must allege that they (1) conferred a benefit upon the defendant; (2) the defendant had knowledge or appreciation of the benefit; and (3) the defendant's acceptance or retention of the benefit without payment of its value is inequitable under the circumstances. *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008).

Defendants argue the Court should dismiss this claim because Plaintiffs "do not plead with specificity any benefit [Plaintiffs have] conferred upon Defendants." Mot. at 12. Plaintiffs did not respond. That failure to respond is, in and of itself, a basis to grant the Motion. Local Rules W.D. Wash. 7(b)(2); *see also Montgomery v. Specialized Loan Servicing, LLC*, 772 F. App'x 476, 477 (9th Cir. 2019) (affirming dismissal of claims where "plaintiffs failed to respond to the arguments raised in defendants' motion to dismiss [the] claims"); *Renato v. Beaulieu*, No. C20-708 RSM, 2022 WL 1607919, at *11 (W.D. Wash. May 20, 2022) (construing plaintiff's "failure to substantively respond as an admission that the motion has merit").

In any event, the Court agrees that Plaintiffs fail to state an unjust enrichment claim. For example, Plaintiffs suggest that they personally advanced funds for the 2023 Annual, but their allegations are clear that Plaintiffs or SeaCats were the contracting party for the event's venues and vendors. *See, e.g.,* FAC ¶¶ 33 ("Plaintiffs retained Helms-Briscoe to

secure the Marriott"), 42 ("Cardona improperly inserted herself into Plaintiffs' hotel and venue negotiations … Plaintiffs – not Cardona – were the contracting party"). Plaintiffs fail to explain how payments made to discharge Plaintiffs' own contractual obligations to third parties are a benefit conferred upon Defendants. Moreover, as to the four individual Defendants, Plaintiffs do not allege they conferred a benefit on them at all—every payment described flowed to the 2023 Annual's venues and vendors, not to Harrison, Cardona, Russo, or Yates-Schiff. Accordingly, Plaintiffs' unjust enrichment claim fails.

As a result, the Court dismisses Count II in its entirety.

### C. Count III: "Breach of Fiduciary Duty, Wrongful Expulsion, and Breach of Good Faith"

Count III combines three distinct causes of action: breach of fiduciary duty, wrongful expulsion, and breach of the implied covenant of good faith and fair dealing. Accordingly, the Court will address these three claims separately.

#### i. Breach of Fiduciary Duty

Plaintiffs attempt to bring a common-law breach of fiduciary duty claim against all Defendants, alleging that the Defendants owed "fiduciary duties of honesty, transparency, and fairness, which Defendants violated repeatedly." FAC ¶ 145.[5] In the Motion, Defendants contend the claim fails because "Plaintiffs do not plead in any way that there was a special relationship with Defendants." Mot. at 17.

To successfully state a breach-of-fiduciary-duty claim, Plaintiffs must plead facts establishing that a fiduciary relationship existed. Such a relationship "between two persons may exist either because of the nature of the relationship between the parties historically considered fiduciary in character; E.g., trustee and beneficiary, principal and agent … or the confidential relationship between persons involved may exist in fact." *McCutcheon v. Brownfield*, 467 P.2d 868, 874 (Wash. Ct. App. 1970).

[5] To the extent Plaintiffs contend that Defendants owed them fiduciary duties under the Washington Nonprofit Corporation Act, RCW 24.03A, the Court addresses that argument in Section IV.H.

Plaintiffs again failed to oppose Defendants' argument. That failure to respond is, in and of itself, a basis to grant the Motion. Local Rules W.D. Wash. 7(b)(2); *see also Montgomery*, 772 F. App'x at 477. Notwithstanding Plaintiffs' non-opposition, the Court also concludes that Plaintiffs failed to allege sufficient facts demonstrating that Plaintiffs and Defendants had a fiduciary relationship. Plaintiffs allege only that they were members of TICA and assert, without further explanation, that "TICA owes [them] statutory duties of good faith, fair dealing, and fair disciplinary process under … common law." FAC ¶ 136; *see also id.* at 4 ¶ 13 ("Defendants' actions constitute … breach of fiduciary duties owed to members under Washington law and TICA's governing documents …"). These are bare legal conclusions that the Court is not required to accept as true. For those reasons, Plaintiffs' common-law breach of fiduciary duty claim fails.

**ii. Wrongful Expulsion**

Plaintiffs claim that Defendants wrongfully expelled them from TICA, alleging that "[d]isciplinary actions were initiated without notice, without a formal complaint, and without written charges — violating TICA bylaws and nonprofit governance norms." FAC ¶ 140. In the Motion, Defendants contend this claim is time-barred by RCW 24.03A.375(5), which states that "[a] proceeding challenging a termination or suspension for any reason must be commenced within one year after the effective date of the termination or suspension." Mot. at 15–16. Plaintiffs respond that "whether any suspension or termination was final or effective presents factual questions not resolvable on a motion to dismiss." Opp. at 12.

Plaintiffs contend that "[w]rongful expulsion occurs where a nonprofit disregards its bylaws or applies discipline selectively." FAC ¶ 136. Though Washington courts generally "refrain from interfering in the internal affairs of voluntary associations," there are limited circumstances in which these disputes are judicially cognizable, including "whether the organization's proceedings were regular, in good faith, and not in violation of the laws of the order or the laws of the state." *Anderson v. Enter. Lodge No. 2*, 906 P.2d

962, 966 (Wash. Ct. App. 1995) (internal quotations omitted); *see also Garvey v. Seattle Tennis Club*, 808 P.2d 1155, 1157 (Wash. Ct. App. 1991) (treating the relationship between a club and its members as contractual and reviewing whether the club violated its own rules).

The Court need not address the parties' dispute over whether this claim is time-barred because Plaintiffs failed to allege a sufficient factual basis for the claim. According to Plaintiffs, TICA's disciplinary actions violated its bylaws, FAC ¶ 140, but they never identify which bylaw, rule, or other procedure TICA failed to follow. Nor do Plaintiffs describe when they were expelled, by what act, or for what purported reason; in fact, Plaintiffs' opposition seems to suggest no final expulsion occurred at all. *See* Opp. at 12 (stating a case "is inapposite because it involved a clear, final termination, which Plaintiffs allege never occurred here"). Plaintiffs' allegations of selective discipline fare no better: that TICA lifted another member's ban, FAC ¶¶ 71, 142, does not plausibly allege that another member who engaged in conduct comparable to that attributed to Plaintiffs received more favorable treatment. In sum, there is no factual basis alleged to make plausible Plaintiffs' claim that TICA's disciplinary proceedings were irregular, in bad faith, or contrary to its own rules. Accordingly, Plaintiffs' wrongful expulsion claim fails.

**iii. Breach of Good Faith**

Plaintiffs assert a claim for "breach of good faith," alleging that "TICA owes statutory duties of good faith, fair dealing, and fair disciplinary process under … common law." FAC ¶ 136.[6] Defendants contend that the claim fails because the duty of good faith and fair dealing is an implied covenant of contract law, and "Plaintiffs do not allege that there was a contract or implied contract between Plaintiffs and TICA or any other defendant." Mot. at 18. Plaintiffs again failed to oppose Defendants' argument. That

[6] To the extent Plaintiffs contend that Defendants owed them a duty of good faith and fair dealing under the Washington Nonprofit Corporation Act, RCW 24.03A, the Court addresses that argument in Section IV.H.

failure to respond is, in and of itself, a basis to grant the Motion. Local Rules W.D. Wash. 7(b)(2); *see also Montgomery*, 772 F. App'x at 477.

Under Washington law, every contract carries an implied duty of good faith and fair dealing. *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991). That duty, however, arises "only in connection with terms agreed to by the parties." *Id.* "If there is no contractual duty, there is nothing that must be performed in good faith." *Johnson v. Yousoofian*, 930 P.2d 921, 925 (Wash. Ct. App. 1996). Here, Plaintiffs do not allege that they had a contract, express or implied, with any Defendant. And to the extent Plaintiffs might contend that TICA's bylaws and governing documents provide the specific terms of their relationship, Plaintiffs do not identify any provision of those documents for which Defendants frustrated performance. Accordingly, Plaintiffs' "breach of good faith" claim fails.

As a result, the Court dismisses Count III in its entirety.

**D. Count IV: "Outrage (IIED) and Negligent Supervision/Ratification"**

Count IV combines two distinct causes of action: outrage/intentional infliction of emotional distress and negligent supervision. Accordingly, the Court will address these two claims separately.

**i. Outrage/Intentional Infliction of Emotional Distress**

Plaintiffs assert an intentional infliction of emotional distress claim, alleging that Defendants "weaponized Plaintiffs' disclosed MRSA hospitalization and RASKC trauma to frame them as addicts and abusers" and "spread defamatory rumors that Plaintiffs were drug addicts, embezzlers, and animal abusers, despite knowing the statements were false." FAC ¶¶ 153–54. Defendants contend that these allegations lack specificity and describe, at most, "insults, indignities, and annoyances" rather than extreme or outrageous conduct. Mot. at 19–20. Plaintiffs respond that the Amended Complaint "alleges a coordinated course of conduct" by Defendants that "a reasonable jury could find extreme and outrageous." Opp. at 8.

To state a claim for intentional infliction of emotional distress, a plaintiff must show: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) the actual result of severe emotional distress to the plaintiff. *Reyes v. Yakima Health Dist.*, 419 P.3d 819, 825 (Wash. 2018). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975)). It is not enough that a defendant acted with tortious or even criminal intent, or with malice. *Grimsby*, 530 P.2d at 295 (noting that liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"). The trial court "renders an initial screening to determine whether the defendant's conduct and mental state, together with the plaintiff's mental distress, rise to the level necessary to make out a prima facie case." *Repin v. State*, 392 P.3d 1174, 1185 (Wash. Ct. App. 2017).

Plaintiffs' allegations regarding Defendants' conduct do not meet this high bar. They largely consist of allegedly false accusations: that Plaintiffs were "drug addicts" who "snorted up the banquet money," FAC ¶ 186; that they were being investigated for animal abuse, *id.* ¶ 187; and that they were responsible for the 2023 Annual's financial shortfall and thus owed TICA a debt, *id.* ¶¶ 68, 86. But false accusations of serious misconduct, even when made with malice, do not constitute "extreme and outrageous conduct." *See Saldivar v. Momah*, 186 P.3d 1117, 1131 (Wash. Ct. App. 2008) (filing of lawsuit alleging sexual abuse by physician, "even with malicious intent," was not outrageous); *Smith v. Gen Con LLC*, No. 82672-7, 2022 WL 2662003, at *5 (Wash. Ct. App. July 11, 2022) (unpublished) (public statements that plaintiff was a harasser and abuser, accompanying his ban from a gaming convention, did not state an outrage claim). Accordingly, Plaintiffs' intentional infliction of emotional distress claim fails.

**ii. Negligent Supervision**

Plaintiffs assert a claim for "negligent supervision/ratification," alleging that "TICA negligently supervised and affirmatively ratified all such misconduct." FAC ¶ 159.[7] Defendants argue the claim should be dismissed because Plaintiffs failed to plead any element of the claim. Mot. at 21. Plaintiffs failed to oppose Defendants' argument. That failure to respond is, in and of itself, a basis to grant the Motion. Local Rules W.D. Wash. 7(b)(2); *see also Montgomery*, 772 F. App'x at 477.

To maintain a claim for negligent supervision, a plaintiff "must show that (1) an employee of the defendant acted outside the scope of her employment, (2) the employee presented a risk of harm to others, (3) the employer knew or should have known in the exercise of reasonable care that the employee posed a risk to others, and (4) the employer's failure to supervise the employee was the proximate cause of the plaintiff's harm." *McDaniels v. Grp. Health Co-op.*, 57 F. Supp. 3d 1300, 1317 (W.D. Wash. 2014) (citing *Briggs v. Nova Servs*., 147 P.3d 616, 622 (Wash. Ct. App. 2006)).

The Amended Complaint lacks any factual allegations suggesting that TICA knew or should have known—before the conduct at issue occurred—that any Defendant posed a risk of harm to Plaintiffs. Instead, Plaintiffs' allegations of TICA's knowledge concern only its response after the fact: that TICA leadership "did nothing to correct false statements," FAC ¶ 92, and "took no steps to correct the [false] narrative or discipline those spreading it," *id.* ¶ 147. These allegations fail to assert that TICA failed to prevent harm that was reasonably foreseeable. Accordingly, Plaintiffs' negligent supervision claim fails.

As a result, the Court dismisses Count IV in its entirety.

**E. Count V: Civil Conspiracy**

Plaintiffs allege that Defendants Harrison, Russo, Yates-Schiff, and Cardona "coordinated actions to defame and remove Plaintiffs from TICA and destroy their

[7] To the extent Plaintiffs assert "ratification" as a separate claim, that is not an independent cause of action but a principle of agency law under which a principal may become liable for an agent's prior act by affirming it. *See* Restatement (Third) of Agency § 4.01 (2006).

reputations" and "acted in concert to commit defamation, wrongful expulsion, conversion, and abuse of process." FAC ¶¶ 165, 168. Defendants contend that the Amended Complaint fails to allege an agreement. Mot. at 17. Plaintiffs respond that an agreement may be inferred from Defendants' coordinated conduct. Opp. at 9–10.

A civil conspiracy "exists if two or more persons combine to accomplish an unlawful purpose or combine to accomplish some purpose not in itself unlawful by unlawful means." *Corbit v. J.I. Case Co.*, 424 P.2d 290, 295 (Wash. 1967). A plaintiff "must show that the alleged coconspirators entered into an [a]greement to accomplish the object of the conspiracy." *Id.* "Mere suspicion or commonality of interest is insufficient to prove a conspiracy." *Ferrie v. Woodford Research, LLC*, No. 3:19-cv-05798-RBL, 2020 WL 3971343, at *7 (W.D. Wash. July 14, 2020) (citations omitted).

Here, Plaintiffs allege no facts showing such an agreement. Plaintiffs' bare allegations that Defendants "coordinated" or "acted in concert," FAC ¶¶ 165, 168, are insufficient to state a plausible claim, and the overt acts they allege, *see id.* ¶ 166, are separate acts by different Defendants at different times that do not, without more, suggest a prior agreement. *See Twombly*, 550 U.S. at 556–57 (stating that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice"). Accordingly, Plaintiffs' civil conspiracy claim fails, and the Court dismisses Count V.

**F. Count VI: Abuse of Process**

Plaintiffs claim that Defendants abused legal process by filing a lawsuit against them in California state court. FAC ¶¶ 170–81. Specifically, Plaintiffs allege that the suit was filed fourteen days after they sent a settlement proposal, *id.* ¶¶ 172–73, and that its ulterior purpose was "retaliation for Plaintiffs asserting their rights, chilling their federal claims, and damaging their reputation," *id.* ¶ 176. Defendants contend that merely filing the lawsuit, even if done with a malicious motive, cannot constitute abuse of process. *See* Mot. at 18–19. Plaintiffs respond that because their abuse-of-process claim rests on

"intentional misuse and continuation of the lawsuit for improper ends," the claim cannot be dismissed. Opp. at 8.

To state a claim for abuse of process, a plaintiff must allege "(1) the existence of an ulterior purpose—to accomplish an object not within the proper scope of the process—and (2) an act in the use of legal process not proper in the regular prosecution of the proceedings." *Sea-Pac Co. v. United Food & Com. Workers Loc. Union 44*, 699 P.2d 217, 220 (Wash. 1985) (quoting *Fite v. Lee*, 521 P.2d 964, 968 (Wash. Ct. App. 1974)). "Some definite act or … objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Batten v. Abrams*, 626 P.2d 984, 989 (Wash. Ct. App. 1981) (describing an "improper purpose" as usually taking "the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself … by the use of the process as a threat or a club").

Plaintiffs do not allege that Defendants used the California lawsuit to obtain any collateral advantage. While Plaintiffs allege Defendants used that action "to manufacture leverage," FAC ¶ 175, they do not specify what, if anything, Defendants demanded *outside* of the scope of the suit in exchange for abandoning it. To the contrary, Plaintiffs allege that Defendants "ignored" their "settlement demand." *Id.* ¶ 93. And that the California lawsuit followed Plaintiffs' demand by two weeks, *id.* ¶ 96, shows at most that the parties' dispute had ripened into litigation—not that Defendants had some improper collateral purpose for the suit. Nor do the post-filing acts Plaintiffs identify suggest an improper purpose: serving the complaint (even defectively), *id.* ¶ 97, amending it, *id.* at 25 ¶ 99, and seeking damages, *id.* at 24 ¶ 98, are acts undertaken in the regular prosecution of the lawsuit. Accordingly, Plaintiffs' abuse of process claim fails, and the Court dismisses Count VI.

**G. Count VII: "Tortious Interference with Business Expectancy"**

Plaintiffs claim that Defendants tortiously interfered with their business expectancies "in the cat-fancy community," including "participating in TICA-sanctioned shows," "clerking, and show-management opportunities," and "breeding, exhibiting, and selling pedigree cats under their Valyria Cattery." FAC ¶ 184. Defendants contend that Plaintiffs fail to specify what business opportunities were interfered with by Defendants or what damages were incurred. Mot. at 12–15. Plaintiffs respond that they plausibly alleged valid business expectancies with "exhibitors, judges, clubs, vendors, buyers, and show organizers within the broader cat-fancy community," and that they need not identify "every lost counterparty at the pleading stage." Opp. at 12.

To state a viable tortious interference claim, Plaintiffs must allege facts showing: "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).

Plaintiffs' allegations fail to satisfy these elements. For example, participating in or hosting TICA-sanctioned shows depends on Plaintiffs' relationship with TICA, which TICA cannot tortiously interfere with. *See Olympic Fish Prods., Inc. v. Lloyd*, 611 P.2d 737, 738 (Wash. 1980). And as to Defendant Cardona, Plaintiffs allege that she communicated with GTCC and the Marriott claiming to be the point of contact for the 2023 Annual, FAC ¶ 188, but they do not allege that either venue breached or terminated its relationship with Plaintiffs as a result. Furthermore, Plaintiffs' allegations that "exhibitors avoided their cattery, kitten-buyers withdrew interest, and Plaintiffs' breeding program collapsed," *id.* ¶ 193, fail to provide any specifics tying any Defendant's conduct to the resulting loss (*e.g.*, which kitten-buyers withdrew interest after hearing whose false statement). That deficiency is compounded by the fact that Plaintiffs attribute some portion

of the harm they suffered to individuals who are not defendants in this action. *See id.* ¶ 191 ("Members of the Petersen–Robinson group circulated false claims that Plaintiffs abused animals…"). Finally, the Amended Complaint itself supplies an "obvious alternative explanation" for the collapse of Plaintiffs' breeding program: King County's seizure of Plaintiffs' animals in September 2023. *Id.* ¶ 60; *see Iqbal*, 556 U.S. at 682. These allegations do not plausibly show that any Defendant's conduct induced or caused the termination of a business expectancy. Accordingly, Plaintiffs' tortious interference claim fails, and the Court dismisses Count VII.

**H. Count VIII: "Violation of Washington Nonprofit Corporations Act"**

Plaintiffs allege that Defendants TICA, Harrison, Cardona, and Yates-Schiff violated five provisions of the Washington Nonprofit Corporation Act, RCW 24.03A *et seq.*, which Plaintiffs describe as requiring, for example, "fair and reasonable disciplinary procedures" and "imposing duties of good faith, loyalty, and care." FAC ¶ 196. Defendants contend these provisions do not govern the conduct alleged and that any challenge to Plaintiffs' suspension or termination is time-barred. Mot. at 15–16. Plaintiffs respond that they "do not assert standalone statutory causes of action under each cited RCW provision" but rather "allege wrongful suspension and expulsion in violation of TICA's bylaws, governing documents, and Washington nonprofit law." Opp. at 11.[8]

None of the provisions Plaintiffs cite in the Amended Complaint imposes a duty relevant to Defendants' alleged conduct. *Compare* FAC ¶ 196, *with* RCW 24.03A.050, .155, .570, .615, .620. RCW 24.03A.570, for example, permits a board to act without a meeting by unanimous written consent, but it does not "impose[] duties of good faith,

[8] According to the Amended Complaint, TICA is a Texas nonprofit corporation. FAC at 5 ¶ 13. It is therefore unclear whether the Washington Nonprofit Corporation Act governs TICA's discipline of its members. Although a registered foreign nonprofit corporation is generally "subject to the same duties, restrictions, penalties, and liabilities" as a domestic nonprofit corporation, the Act "does not authorize this state to regulate the organization or internal affairs of a registered foreign nonprofit corporation." RCW 24.03A.265(1)–(2). The Amended Complaint does not address whether TICA is registered in Washington, and neither party addresses this issue. Because Plaintiffs' claims fail regardless, the Court assumes without deciding that the Act applies.

loyalty, and care," as Plaintiffs allege. FAC ¶ 196(c). Likewise, all of Plaintiffs' allegations under Count VIII—concerning conflicts of interest, ultra vires acts, and breaches of good faith and loyalty, FAC ¶¶ 203–13—rest on provisions that impose no such duties, and they fail for that reason. The statute that does govern the termination and suspension of memberships provides only that a membership "may be terminated or suspended for the reasons and in the manner provided in the articles or bylaws." RCW 24.03A.375(1). Thus, Plaintiffs' statutory challenge to their suspension or expulsion turns on TICA's governing documents and, as discussed above, Plaintiffs fail to identify any bylaw, rule, or procedure that TICA failed to follow. *See supra* Section IV.C.ii.

Because Count VIII fails on these grounds, the Court need not reach Defendants' argument that this claim is time-barred. Accordingly, Plaintiffs' claim under the Washington Nonprofit Corporation Act fails, and the Court dismisses Count VIII.

**I. Leave to Amend**

Plaintiffs ask for leave to amend their complaint. Opp. at 14. This Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Because the deficiencies identified above may potentially be cured by amendment, the Court, in its discretion and in light of the leniency afforded to *pro se* litigants, grants Plaintiffs leave to amend their complaint. Any second amended complaint should clearly and comprehensively identify all claims asserted, who they are asserted against, and the factual basis for each claim.[9] Failure to plead sufficient facts to state a claim may result in dismissal without further opportunity for amendment.

//

//

[9] The Court notes that in Plaintiffs' opposition brief, they attributed the statement that an agreement "may be inferred from conduct and surrounding circumstances" to *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1096 (9th Cir. 2015). Opp. at 9. No such language exists in *Stanislaus*, which ends before the page number cited. Plaintiffs are cautioned to verify that each authority they cite exists, is accurately cited, and supports the proposition for which it is offered. Future filings containing unverifiable citations may result in sanctions.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss, Dkt. No. 29, as follows:

1. The Motion is **DENIED** as to Plaintiffs' defamation and false light claims in Count I to the extent they are based on (i) Defendant Russo's statements, as against Russo in her individual capacity; and (ii) the October 11, 2023 statement, as against Defendant TICA and against Defendant Harrison in her individual capacity.

2. The Motion is otherwise **GRANTED**. All other claims in the Amended Complaint—including any remaining claim in Count I and all claims in Counts II through VIII—are **DISMISSED WITHOUT PREJUDICE** with **LEAVE TO AMEND** within 21 days of the date of this Order.

3. If Plaintiffs do not timely file a second amended complaint, the case will proceed on the surviving claims identified above, and Defendants shall answer the Amended Complaint as to those claims within 14 days after Plaintiffs' deadline to amend expires.

Dated this 23rd day of September, 2026.

The Honorable Richard A. Jones
United States District Judge